and Mr. Eccles. Good morning, your honor. Whenever you're ready. I'm ready to begin your honor. Good morning, honors. My name is Eli Eccles, I represent the respondent. Sorry the petitioner here, South on song. Miss song is an applicant for admission. for adjustment of status. And it's our argument today, your honor that the Board of Immigration Appeals decision in this case is not deserving of deference under matter of Chevron, because it's a represents an abuse of discretion, it's an unreasonable decision. And your honor. The, this case is not about whether an affidavit of support applies. As the government has noted in their brief, we are not attacking sort of the overall statutory scheme here, but there there is a silence in the statute about whether about how and whether a petitioner can withdraw their affidavit of support. And it's our argument that in this silence. The administrative agency here should be reasonable in the way that it interprets the regulations to apply. And so how is it that they were unreasonable here what makes their decision unreasonable in this case. Yes, we think your honor. Well, the, what we would we would point to matter of CCA, the court here found and the board found that the petitioner here is eligible to adjust your status under the terms of matter of CCA despite the fact that she's been divorced by the petitioner. That whole case stands for the idea that there's some gaps in relation to the fiance petition, and the adjustment of status scheme and the immigrant versus non immigrant visa scheme. That case said that the, they should be the gap should nevertheless be construed to allow fiance's to continue to adjust status, even though they cannot satisfy the literal terms of the statute. That's the background here. Now, here, the, the petitioner divorced. Sorry, the, the US citizen petitioner divorced. Miss song, and the board found she was still eligible to adjust where it went unreasonable was when it sort of undid everything CCA stands for by allowing the petitioner to essentially have a veto power, a unilateral veto over the process by withdrawing the affidavit of support. Council, if I could, if I could interrupt. I appreciate your, I think I understand your argument in response to just Thacker that CCA is kind of the basis if, if, if, if the board is going to relax 1255 D, why not relax the regs on withdrawal of affidavits. But, but isn't it the case that, you know, first of all that the regs on withdrawal of affidavits by their, you know, plain terms would permit the withdrawal here. I mean I know you have an objection to it but the just reading the black and white of the regs would allow the petitioner Mr saying I think to have withdrawn the affidavit is that do you agree with me on that. Yeah, I think, I think I have to agree with you on that. If we're under the reg that explicitly applies to adjustment status. Okay. So, if I could follow up, go ahead and finish I asked you a question I don't want to let you finish but I have a follow up. Go ahead with your follow up. So, so if the regs say that, then as you know, they have to be unreasonable. And why is it not unreasonable to for the agency to have different rules for fiance. You know, whether you agree with it or not, whether it's perfectly consistent with the say or not, why is that not within the realm of reason. We are the both of the IJ and the VA here appear to have taken a position that as administrative agencies they can't really make a ruling on the validity of the regulations themselves. So I don't think they really took this head on. And I think the, the unreasonableness lies in the application of the regs not in the regs themselves, so that that this decision it's not the regs that don't deserve the Chevron difference but it's this decision that that doesn't deserve difference genre, because the court here failed to do what she said did which is taken into consideration the special circumstances of a fiance, who's uprooted themselves and moved to the United States in reliance on this marriage working and in reliance on the petitioners good faith. The, the regulation. There is a regulation that exists that would protect this reliance, and it's the next section of that regulation about the withdrawal of the petition of the affidavit of support your honor. And so all we're saying is that it is unreasonable for the court and the VA here to prevent the risk, the applicant the petitioner here from presenting a substitute sponsor, where the regs do contemplate such thing in many different areas. If they simply declined to give the withdrawal of the affidavit of support legal force, because, again, the petitioner did file it, and all the regs required to have a joint sponsor, or is if it's been filed. All they have to do is not give the withdrawal legal force, and she'd be able to present a joint sponsor that would cure the public charge grounded in admissibility. It's not that we're asking for a new exception, or anybody to edit a regulation not asking for a court to rewrite anything, but simply to apply in this very similar legal fiction as applied in see say apply the immigrant visa regulation, rather than the adjustment of status regulation. And the reason we think it's unreasonable not to is because in this particular part of the process, the respondent much more resembles the immigrants than the person who's already here in that she's only here based on all that reliance. Mr. Nichols, can I, so in response to Judge Quattlebaum's question, it sounds like you are asking or suggesting that the BIA should have ignored the regulation, because I think as you have to concede that the issue is that the regulations do provide for a substitute or joint sponsor in the context of an immigrant visa, but not in this context when you're dealing with a non-immigrant visa. Now you may think that's patently unreasonable, but that would require both the BIA and this court to ignore the regulation. Well, I don't think the distinction here is between immigrant and non-immigrant. The distinction here is between whether it's an adjustment of status, pure, normal, average adjustment of status context, or whether it's an immigrant visa context. Because CSA has already said that this should be treated as an immigrant visa, not as a non-immigrant visa. So that part's settled. And I'm not so much asking the court to ignore the regulation You're not alone in this, right? The USCIS questions and answers support you, correct? Well, Your Honor That the BIA applied the wrong regulation. So, Your Honor, that's what I thought when I read those questions and answers, and that's what I thought when I filed that motion to reopen. But upon reading them further, I think that actually much of what looks like it supports us is just a restatement of a question. And the paragraphs that come after that are actually USCIS saying that they're not going to do it that way. So, unfortunately, I don't actually think those questions and answers helped me, which I didn't realize until after I had filed the motion to ask for the motion to reopen had been denied. Okay, I thought I was trying to help you as well. Yes, Your Honor. I appreciate that, Your Honor. I guess you can't be helped. Go right ahead. Respectfully, I think this court can help the petitioner by declining to defer to this case on the basis of the fact that it's not that we're asking them to ignore a regulation. We're asking that the board be told that they should have applied the second part of the regulation, the part that applies to the immigrant visas, rather than the part that applies. And that's based on CSA? Because CSA doesn't talk about admissibility or inadmissibility. Correct. CSA repeatedly states that as long as the applicant remains admissible, then they're eligible to adjust. And so really, CSA didn't take on this issue, partly because in CSA, the petitioner did not withdraw the affidavit of support. And that's part of what we're arguing here is that the danger here is, is to, if you're going to open the door with CSA and permit this person a chance to still adjust based on all the equities involved in being a fiance, and having relied on the marriage It's contrary to that whole effort to then give the petitioner a unilateral veto by allowing the petitioner to withdraw the affidavit of support. And there's no remedies to that, unless there's abuse or the petitioner is dead. There's no remedy to the petitioner withdrawing the application when the whole purpose of CSA is to provide them still with a path for You mentioned abuse. Was there any indication in the record here that petitioner was a victim of domestic violence? No, Your Honor. No, Your Honor, there isn't. Okay. I would never wish anybody to be a victim of domestic violence. And so I'm glad there wasn't. But it leaves our, my client is still just as vulnerable to a predatory kind of behavior by a US citizen spouse as someone who is a victim of abuse because here, Mr. And there was no remedy. So while they, you know, they courted and loved each other and she relied on that and came over and they married. Some marriages fall apart. And here we have a situation where this, this policy by refusing, by allowing a K-1 petitioner to withdraw an affidavit of support. You're essentially exposing the non-citizen to a form of abuse. And it also empowers bad faith actors more than it does good faith actors. If in a bad faith situation where there is actual marriage fraud going on, you know, they don't need to worry about withdrawing an affidavit of support that's already faked into whatever conspiracy they have going on. It's really only in situations of a good faith marriage where after it falls apart, the petitioner, you know, has an emotional reaction to the situation. It's only in those circumstances where the petitioner would care to withdraw the affidavit of support. Mr. Echols, you made the point, and I do stand corrected about the distinction I made earlier is that the regulations do make a distinction with respect to immigrant and non-immigrant visas in the context of withdrawal, right, of the affidavit of support. And you also discuss CISAE, which – and you indicated that the court there or the BIA indicated that divorce by itself does not necessarily prevent adjustment of status because, as in CISAE, the petitioner, the sponsor did not withdraw the affidavit. And I think the BIA in this case made that point, that in theory this is not completely illogical because Mr. Song, even though seeking a divorce, could have continued to allow the affidavit of support to remain in place. What's unreasonable about that? Well, again, that would still remain essentially a unilateral veto here. There's nothing about the divorce where Mr. Song would have to consent to that. As far as I know, I'm not an expert in divorce law. And it just – to our argument, essentially, when it boils down to this, in this circumstance, the applicant here, the non-citizen here, should continue to be treated as someone who's essentially abroad. They're still trying to get here. And that's because of the reliance that she's placed on it. Under that scenario, if she was treated under the second section of the regulations, Mr. Song's withdrawal of the affidavit of support would not have any legal effect because she's already disembarked from Cambodia, flown all the way over here, and set up her life here. Under those circumstances, an immigrant visa cannot be revoked. And without revoking an immigrant visa, you can't withdraw an affidavit of support. If you want, under CSAE, to establish a way for a person like Ms. Song to continue to adjust status, then you should protect her from a unilateral veto by the petitioner. And it's a very simple remedy. You just continue to treat her like she's abroad, like she's an applicant for an immigrant visa. Don't treat her like she's an adjustment status applicant because that exposes her to that unilateral veto. Failure to do that, we believe, is unreasonable. The court unreasonably failed to consider this and continued to assert that it just had no jurisdiction over regulations. We're not asking for any kind of different treatment. We're not asking to freeze the adjudication at any odd time. We're simply saying that she should be permitted to present a substitute sponsor and that she'd be able to do that if the withdrawal of the affidavit of support was not given legal effect. Thank you, Your Honor. Thank you, Mr. Echols. All right, we'll hear from the government. May it please the court, my name is Neelam Isanula and I represent the United States Attorney General in this matter. The court should find that the agency properly denied Ms. Song's application for adjustment of status on the basis that she was inadmissible as someone likely to become a public charge. It should be noted here that Petitioner Song does not challenge the fact that she was obligated to provide an affidavit of support from the individual who filed her underlying fiance visa petition here, Mr. Singh. Her only argument really is that Mr. Singh should not have been allowed to withdraw the affidavit of support, citing the regulations at 8 CFR 213A.2 F1. But as we've discussed, as my friend opposing counsel has discussed, there is a difference between F1 and F2 and F2 is the clearly applicable provision to Ms. Song. If we look at these two regulatory subsections, they clearly map onto the two different ways that an individual can obtain a permanent residence or what we call green card status informally. F1 maps onto the consular processing process. Counsel, if I could just interrupt you because I think I understand where you're going there. And I think your colleague largely agrees with that, that under the regs, it's different. And if applied strictly, the withdrawal here would be OK. What he says is that the CSA case provides leeway in certain areas, particularly with respect to 1255D. And it's kind of unreasonable to grant that leeway there in the case of divorce, but not here. And doing so exposes, you know, clients, people like his client, you know, to reliance or to, you know, situations. What's your response to that? Matter of CSA is a limited case. It doesn't have the broad applicability, the broad sort of holding that the petitioner is arguing for. Matter of CSA was addressing mainly the fact that there are two requirements in the adjustment of status statute that don't have a clear or they have very confusing application to K-1 visa holders. And that's the requirement that you have an immigrant visa, that you're eligible for an immigrant visa, and that the immigrant visa is immediately available to you. These are provisions that don't map onto the K visa context, where an individual is actually applying for adjustment of status based on a non-immigrant visa petition, the approved fiance visa petition. So Matter of CSA was really addressing what they called the absurd result of disqualifying all fiance visa holders from statutory eligibility if they were to read the statute literally and apply the immigrant visa requirements to K-1 visa holders. Counsel, it did that, and that was one part of the holding effectively regarding subsection A, that that's kind of nonsensical to have A be only for immigrant visas if you have the whole K-1 process. So that's one thing, but I think what counsel is maybe talking about, maybe I'm wrong, but with a little more emphasis is the holding with respect to 1255D, where it seems like CSA pretty much ignored the plain language of D. And maybe you don't think that's what it did. I'm curious to what's the Attorney General's position on whether CSA is reasonable with respect to that second issue about the failure to consider divorce in relation to subsection D. I understand what you're talking about, Your Honor. I do want to kind of keep going with that discussion because it bleeds into each other. So the fact is that the board in CSA really had to create that legal fiction in order to make sure that the adjustment of status process was available to K-1 visa holders. And so the DHS at that point was, well, if you're going to apply this legal fiction that treats these individuals as immediate relatives, well, then Mr. CSA should be denied adjustment of status on the basis of the fact that he is no longer married. And so he doesn't meet the visa classification of an immediate relative if he was to be treated like the spouse of a U.S. citizen outside the K-1 fiance context. So the board said, well, no, we are not going to extend the legal fiction that far. And so it said, you know, Mr. CSA is instead of, you know, proceeding on the basis of an I-130 visa petition, the type of visa petition that extends to spouses of U.S. citizens outside the K-1 context, Mr. CSA proceeds on the basis of the fiance visa petition. And the regulations there do allow, well, they are silent as to the effect of divorce on the petition, on the underlying petition. So because the regulations did not require revocation in the case of divorce, the board was declined to extend that legal fiction and allowed Mr. CSA, who had divorced subsequent to his admission on the K-1 visa, to obtain adjustment of status. And so these holdings kind of bleed into each other, but it's important to know that... And why shouldn't someone who divorces prior to adjustment of status be accorded that same opportunity, that the sponsorship not be withdrawn, or at least that they could substitute a sponsor? Well, do you mind explaining that a bit more? I mean, I can ask, I can answer why they shouldn't have to provide... Why shouldn't someone in petitioner's petition who came over here in good faith and married Mr. Song be subject to the whim of Mr. Song divorcing her prior to adjustment of status and then withdrawing sponsorship so she is now considered a public charge? Okay, I understand your question now, Your Honor. And then Mr. Song could just find somebody else to bring over and marry for a year and divorce and send them back and find somebody else. Why is that? That doesn't seem reasonable. Well, what you're mentioning here, these repeat fiancé visa petitions, they actually are a concern that Congress had. And Congress enacted protections into the fiancé visa context that addresses repeat fiancé visa petitions. It essentially bars them. I can't remember the exact number. But so addressing Mr. Song... Yeah, that impacts Mr. Song. But if you're the first person in the chain, like petitioner is, what's the protection for her? Well, the protection is, is that she, you know, is able to adjust her status, you know, that the divorce alone does not serve as a bar to adjustment. However, she still has to have the cooperation of the underlying fiancé visa petition sponsor. And that is... So that goes back to the imbalance of power argument that opposing counsel was making. Unfortunately, it's a product of the statute, the statute plainly and the regulations, which plainly require that the affidavit of support has to come from the fiancé petitioner, in this case, Mr. Sang. You know, Ms. Song does not challenge this fact. That's a recipe for abuse and domestic violence and control in these marriages. Well, if there is... The spouse, the sponsoring spouse could just threaten constantly to withdraw the sponsorship up until... Yes. So if there is a situation where the citizen spouse is holding, you know, the visa petition over this individual's head and using it to cause abuse, it can be a basis for a self-petition on an I-360 form. But then again, we're getting out of... She has not alleged abuse, but that is an exception that's recognized to the affidavit of support requirement. And that's one of the points the board makes, that there are recognized exceptions to the affidavit of support requirement in the statute, but they simply don't encompass divorce. Divorce is not something that exempts you from having to file an affidavit of support from the spouse who filed your underlying visa petition. Well, it doesn't... It may not as a matter of theory, but as a practical matter, I mean, CISAE may be the exception to the rule. Of course, we have no record evidence of how likely it is that a divorce sponsor is going to remain a sponsor after a divorce. But as a practical matter, doesn't that make it almost impossible for a petitioner in Ms. Song's case to adjust status? Well, as the board mentioned, it is possible that there are going to be situations where the individuals in the marriage contract, and she might waive her ability to sue under the contract, and he might allow... He might agree to proceed with the affidavit of support. The affidavit of support has a very low financial... From place of privilege, it's low. It requires that the petitioner provide... The sponsor provide support that's equal to 125% of the federal poverty guidelines. You can imagine that there are situations where in divorce, people are already paying sums that are higher than this, and they might be willing to continue with the affidavit of support and stay on to benefit the other side. But either way, these sort of policy considerations were sort of a bit on dangerous ground. Recently in Patel, the Supreme Court explained that there is no jurisdiction over a decision regarding the granting or denial of adjustment of status. And so this case is a typical decision regarding the denial of adjustment of status. Petitioner has, I think, Ms. Song has preserved legal questions under 1252 A2D. So if she's going to raise these sort of factual arguments and policy arguments, we veer into territory that Patel might cover. Because in Patel, the Supreme Court said that factual questions underlying the denial of adjustment or granting of adjustment are unreviewable. And so we do have to stick to the legal questions here. The one issue response to the USCIS saying that it is reasonable to conclude that a sponsor's ability to withdraw the Form 864 is governed by F-1 rather than F-2. Do you mean the minutes that were put into the record for the motion to reopen case? Yeah, the question and answer from the USCIS. And the answer being, it is reasonable to conclude that a sponsor's ability to withdraw, blah, blah, blah, is governed by F-1 rather than F-2. I think that, you know, that is a tentative position that was, it's not official. You know, and it seems to be, you know, as my friend suggests, that it seems that there was some sort of going back and forth at the agency level because AILA is suggesting with its questioning that it's getting denials that go the other way. So it's a bit confusing. But what we do know is that it's a tentative position. It says, in other words, USCIS believes that if the petitioner has submitted the form, he or she cannot, and that's italicized, cannot validly withdraw it after the date of the K-nonimmigrant admission. I mean, so if it is USCIS saying that F-1 should govern, we know that one month later, USCIS denies Song's application for adjustment of status using a completely different position. So they're saying that Mr., they deny because Mr. Sang could withdraw his affidavit of support under F-2. And did he, I know he filed a, I know he asked to withdraw it. Where in the record did he, he actually did, he was actually granted permission to withdraw it? He filed a letter informing USCIS. And so as part of the adjustment denial, they, you know, they indicate, I don't think that they have to grant. Okay, so it's just as part of, it's assumed in the adjustment denial where they say, because you don't have a sponsor anymore, that he withdrew. So USCIS says that the affidavit of support has been withdrawn. USCIS has received a withdrawal from the petitioning sponsor, Mr. Sang. So I mean, one of the, I think, important points to mention is that to the extent that petitioner wants to rely on a co-sponsor, seems to believe that she can rely on a co-sponsor, this is plainly contradicted by the statute. There are only two provisions in the INA that allow for a non-petitioning sponsor to submit an affidavit of support. And those two situations are joint sponsors and substitute sponsors. Joint sponsors can come in when the primary, the petitioning sponsor, does not meet the income requirements for the affidavit of support. A substitute sponsor can come in when there's a debt and the substitute sponsor is related in some familial way to the non-citizen. But neither of these situations cover this context of divorce, of disillusion of a marriage. And so again, we're left in a situation where the INA has not, has created exceptions that, you know, that don't bear on the divorce context that suggests that divorce is not something that is exceptional in terms of the affidavit of support requirement. Just going back to matter of CISAE, it's important to, I think, consider the fact that, as your honor has already pointed out, CISAE did not address the admissibility requirement. I mean, crucially, it did not say that the admissibility requirement was ambiguous, which is what it said about the immigrant visa requirements. It points out that under both the prior K-1 adjustment statute and current law, non-citizens are obligated to establish their admissibility in order to procure adjustment. I think it's very important to point out that the prior K-1 visa adjustment statute actually also included an admissibility requirement because it takes away the idea that the statute is ambiguous in the context of, that the language about admissibility is ambiguous in the 1255A context. Because as long as the K-1 visa category of, you know, non-immigrant petitions has existed, it has been required that they show their admissibility, that they are otherwise admissible as part of their adjustment of status application. Matter of CISAE simply results from dealing with ambiguous statutory provisions that aren't relevant to our case, where we're talking about the admissibility provision of 8 U.S.C. 1255A-2. The holding of CISAE can't be read broadly as petitioners suggest. The idea that every time we see the term immigrant visa cases in the INA, that idea that it would mean it covers K-1 visa holders simply doesn't bear out. Counsel, can I ask a question? So, if the sponsor in this case had gone overseas and married Ms. Song and then sought to adjust status by bringing her back to the U.S. and somewhere along the way withdrew his petition for affidavit of support, could Ms. Song have relied on another substitute sponsor in that context? So, let me just make sure I understand the situation. In other words, it's not a K-1 visa, not a 90-day visa. It's a situation of a U.S. citizen marrying a spouse overseas and then seeking to adjust status. In that context, if there's a divorce along the way, would that spouse then be able to get a substitute sponsor? No, Your Honor. And also, the divorce, as Matter of CISAE points out, the divorce in the immediate relative context, it will terminate the I-130 petition. So, that immigrant visa case just goes away. But also, we know from the substitute sponsor provision in the INA, it's only triggered by a death. And it requires that the substitute sponsor be somebody related to the noncitizen. So, the substitute sponsor provision cannot help the noncitizen in that case. Also, though, your hypothetical drive point, in many ways, Ms. Song is more, she's luckier than that immigrant visa who's divorced, the immigrant, the individual coming over for the immigrant visa. She can at least still pursue adjustment status. She just needs to have the cooperation of Mr. Singh for purposes of the affidavit of support. The immigrant visa person doesn't have that luck, doesn't have that same situation. Unless there are other questions. Did the BIA acknowledge or consider this AILA question and response that I read to you earlier? When they denied the motion to reopen, they said that that was not new evidence. And it wasn't sufficient. It was kind of like legal arguments. So, it wasn't sufficient for either a motion to reopen or a motion to reopen. Initially, initially, did they consider it? I think, you know, they considered what provision applied to Ms. Song and Mr. Singh. And in matter of Song, we see them, they say that he was permitted to withdraw the affidavit of support under F-2. They cite F-2 on both of the last pages of that decision.  Council, you're about to run out of time, and I don't think you answered the question. The question was whether or not the BIA considered that guidance from USCIS in their initial decision. No, I don't believe the guidance was brought to the agency's attention. That was the basis of the motion to reopen. Well, you used the fact that the agency made their decision after this guidance as a reason that this guidance shouldn't be followed. But they didn't even consider it. When I asked you about this guidance, you said, well, it's not applicable because they didn't apply it. Your Honor, I think I'm confusing you, unfortunately. So the USCIS ALM minutes came out in October 2012. And then in November 2012, the USCIS denies the adjustment of status application on the basis that F-2 was applicable and he could withdraw his affidavit of support. And they didn't consider or acknowledge this guidance in doing so, correct? They didn't because there's no evidence that this guidance is binding. And it's not like the matter of song, which is a published board decision. But it might make their decision unreasonable to the extent they didn't consider it, even if it's not binding. It's unofficial policy. And it seems to be, you know, not a longstanding policy at all, considering that in one month's time, they're reconsidering it if they are. And either way. You said they didn't reconsider it. You said they didn't reconsider it because it wasn't new evidence. At the motion to reopen. And now you're saying they did reconsider it. I'm sorry. Anyway, they didn't consider it. We can agree to that. They did not consider it. Correct. Either way, it's unnecessary for them. I understand your argument. All right. Thank you, Your Honor.  Mr. Echols, you've got some rebuttal. Thank you. Thank you, Your Honors. I want to, first of all, start by addressing those AILA minutes. And I just want to be clear again here. I don't want the court to end up in a position of feeling in any way misled. Page 47 of the administrative record, the part that's underlined by and emphasized by Penn, it's now my reading of these minutes, that that part that is underlined is, I just want to be clear. I don't, I no longer think that that part is a statement of a position by the government. It seems to me it's a restatement of AILA's question. So I don't, I think what DHS's position is more spelled out in the four or five paragraphs that come after that. And I don't believe they support my position. So I just want to be very clear about that. And I think what the government is arguing here, what my friend is arguing here, is that even if this represents an ongoing conversation behind the scenes between, you know, the advocacy that AILA conducts, you know, all year long, and decisions the agency makes, I believe they're arguing that the decision obviously reflected that in the end, in this case, the government did not take the position discussed in these minutes. And I understand that. In this case, we are simply, in this case, an affidavit of support was filed by the sponsor. It was filed. At which point, let's say the sponsor had shown insufficient income. My client then would have been able to secure a co-sponsor and meet and defeat this grounded in admissibility. All we're asking is that the – given the unique circumstances of a K-1 visa and adjustment, that section F-1 be applied, which would mean that Mr. Seng's withdrawal of the 864 would not be given legal effect, which would mean it's still there. And all the agency has to do is consider it a zero because he's not participating, obviously, you know, symbolized by the divorce, and allow her to have a co-sponsor to go with it since the 864 would still be there in the record. That's all that would be required for a matter of CSA to then have full effect, where here a matter of CSA is undermined by the unilateral veto of the petitioner simply sending a letter stating that they'd like to withdraw the 864. We're not asking for a reshaping, and again, as far as Chevron goes, I'd just like to point out the statute. There may not be the same ambiguity because we're not dealing with the same situations in CSA settled, but the statute itself makes no comment about – at least none that I can find and none that I think the government has cited – about the withdrawal of the 864. That's not anywhere in the statute. It's only in the regs. And so there's really – I don't think there's really any reason why the agency here can't use the same creativity that it used in CSA to apply the immigrant visa section of the withdrawal rules rather than the adjustment status rules. Your Honor, your question about the hypothetical of someone immigrating. If they married in Cambodia, she would land – and they did the immigrant processing at the consulate in Cambodia. They would land here – she would land here with her green card. She would instantly be a lawful permanent resident. Her reliance would be rewarded with her status. The weird thing about the fiancé visa is she lands here still with no permanent status, and the complexity of the structure is all about trying to protect against fraud but still provide for a nonimmigrant fiancé to arrive and have a process of them completing the arrangement. And so that's why we think she's still more analogous to that immigrant visa context rather than the adjustment of status context. The reliance issues are completely different. So, Your Honor, unless you have more questions, for all of those reasons, we would request that you not apply Chevron deference to this case in matter of song and that you either vacate the decision and issue a decision of your own or that you simply vacate the decision and demand the matter for further consideration of these arguments about the regulations.  Thank you, Mr. Echols, and thank both counsel for their arguments this morning. We appreciate it very much. And with that, the court will stand adjourned until tomorrow morning.
judges: Albert Diaz, Stephanie D. Thacker, A. Marvin Quattlebaum Jr.